### UNITED STATES of America, Plaintiff–Appellee,

v.

**Ulysses TINES (94–5920), Glynn Bridgeforth (94–5923), and Belinda Marshall (94–5926), Defendants–Appellants.**

**Nos. 94–5920, 94–5923 and 94–5926.**

United States Court of Appeals, Sixth Circuit.

Argued July 31, 1995.

Decided Nov. 29, 1995.

---

**9.** Plaintiffs properly moved first for a stay in the district court, which was denied on August 21, 1995.

Lawrence J. Laurenzi, Asst. U.S. Atty., Office of the U.S. Atty., Memphis, TN, Louise A. Lerner (argued and briefed), U.S. Dept. of Justice, Civil Rights Div., Appellate Section, Washington, DC, for U.S.

T. Clifton Harviel, Jr., Federal Public Defender (argued and briefed), Office of the Federal Public Defender, Memphis, TN, for Ulysses Tines.

Charles Waldman (argued and briefed), Memphis, TN, for Glynn Bridgeforth.

W. Otis Higgs, Jr. (argued and briefed), Peete, Higgs & Armstrong, Memphis, TN, for Belinda Marshall.

Before: JONES and BOGGS, Circuit Judges; CHURCHILL, District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Defendants Ulysses Tines, Belinda Marshall, and Glynn Bridgeforth appeal their convictions for depriving prison inmates of their civil rights under color of state law, in violation of 18 U.S.C. §§ 2 and 242. For the following reasons we affirm their convictions.

## I.

Tines, Marshall, and Bridgeforth were employed as prison guards by the Shelby County Sheriff's Department at the Shelby County Jail in Memphis, Tennessee. Marshall was the lieutenant in charge of the second floor, including the P and Q pods, which housed juvenile detainees. Tines and

---

* The Honorable James P. Churchill, United States District Judge for the Eastern District of Michi-

gan, sitting by designation.

Bridgeforth were deputy jailers on duty elsewhere in the jail.

On September 6, 1991, a fight broke out between several inmates in the Q pod common area. After an argument, several veteran inmates severely beat two new inmates and stole one of the new inmate's tennis shoes.[1]

After the fight, Defendant Marshall met with her supervisor, Inspector Benson, who instructed Marshall to conduct a "shakedown" of the pod in order to find the stolen shoes. A number of officers were summoned by Marshall to conduct the shakedown, including Defendant Bridgeforth and witness Sergeant Robert Yarbrough. As the officers began arriving at the second floor control room, Marshall told them that they were going to shake down the pods, find the tennis shoes, and "whip the ass[es] of the inmates who stole the shoes and sen[d] them to the Med." J.A. at 317, 319, 868–67, 909. Marshall summoned more "heavyweights," to replace the "lightweights," who could not hit hard enough, and were sent back to their posts. J.A. 320, 868–69, 629–30. Marshall huddled with the officers and repeated her instructions to find the shoes, whip asses, and send inmates to the Med. J.A. at 872; *see also* J.A. at 348. Marshall told the officers in the room that they should leave if they did not want to participate or have to write up a report. J.A. at 307–08, 814.

Marshall left the huddle and returned with handcuffs, leg irons, and stun guns. Defendant Tines announced that he knew where he could find riot sticks. With a nod of approval from Yarbrough and no objection from Marshall, Tines went to the jail's main control room and brought back several riot batons. He kept one of the batons and gave the rest to other officers. The officers then proceeded to the Q pod.

Once in the pod, one of the officers located the shoes in a ventilation shaft near cells 6, 7, and 8. At this time, cell 8 housed inmates Garren Adams and Victor Chaney; cell 7 housed inmates Richard Owens, Robert Gamble, and Vander Moore; and cell 6 housed inmate Robert Coleman. None of these inmates participated in the earlier fight with the new inmates.

The officers ordered the occupants of cells 6, 7, and 8 to dress and come out into the hallway. Adams and Chaney reached the hall first, where several officers, including Yarbrough and Defendants Tines and Bridgeforth grabbed and assaulted them. The Defendants punched and kicked the inmates and struck them with riot sticks. The officers also stunned the inmates by repeatedly firing the stun guns.

Next, the officers ordered Owens, Gamble, Moore, and Coleman out into the hallway. These inmates were also beaten, kicked, and stunned. The beatings continued until the officers were informed that internal affairs was on the way to investigate the disturbance.

During the beatings, Marshall remained in the second floor control center where she could see the activities on the floor. Sergeant Yarbrough testified that he could see Marshall in the control room while the last four inmates were being beaten. Marshall did not intervene at any time.

The six inmates suffered abrasions, contusions, and lacerations. Among other injuries, Adams suffered a fractured humerus; Chaney suffered a broken nose and fractured ribs; Coleman suffered a fracture of the medial wall between the eye socket and the nose; and Owens suffered retinal hemorrhaging as well as broken bones in both his nose and eye socket. After the beatings, Officers Bridgeforth and Yarbrough fabricated an account of the events leading up to the beatings. They drafted a memo stating that as the officers entered the Q pod to conduct the shakedown, the cell doors opened suddenly, and all six inmates rushed out of the cells, attacking the guards with homemade weapons. Marshall approved the memorandum and ordered Yarbrough to call a meet-

---

1. None of the inmates involved in this altercation were victims in the convictions of Tines, Bridgeforth, and Marshall. After breaking up the fight, the jail security force took the victims to receive medical treatment for their serious injuries. One of the new inmates was beaten to unconsciousness and discovered with "Nike" shoe prints on his face, arms, and back as a result of being stomped on by the other inmates.

ing of the other officers who had participated in the beatings and directed them to file written reports consistent with the fabrication. After the meeting, several officers, including Yarbrough and Defendant Bridgeforth, filed false reports.

## II.

A federal grand jury returned a seven-count indictment against Marshall, Tines, Bridgeforth, and four other codefendants. The first count charged all seven Defendants with conspiring to deprive the inmates of their civil rights, in violation of 18 U.S.C. § 241. Counts two through seven charged the seven defendants with acting under color of state law, aiding and abetting one another, to deprive six specified inmates of their civil rights, by willfully beating and assaulting the inmates, in violation of 18 U.S.C. §§ 2 and 242.[2] Each Defendant pleaded not guilty to all counts.

The first trial of this case ended in a mistrial after the jury failed to reach a unanimous verdict.

The Defendants were tried again on all of the original counts. In the second trial, which is the subject of this appeal, the jury returned a partial verdict, finding Marshall guilty on four counts, Tines guilty on two counts, and Bridgeforth guilty on one count.

The jury was hung on the other relevant counts. Defendants were sentenced, and they appeal their convictions.

## III.

Defendants raise the following issues in their appeal: (1) whether the district court erred by giving an *Allen* charge; (2) whether the court erred by permitting a full read-back of the testimony of John Littles; (3) whether the district court erred by refusing to investigate allegations of juror impropriety; (4) whether the trial court abused its discretion by excluding evidence of recent inmate violence at the jail, as relevant evidence supporting the Defendants' actions; and (5) whether the evidence at trial was sufficient to support the jury's guilty verdict.

## IV.

Defendants Marshall and Bridgeforth first appeal the district court's decision to give an *Allen* charge after the jury announced its inability to reach a unanimous verdict. The United States Attorney requested the *Allen* charge when the jury failed to reach a verdict after approximately a day and a half of deliberations. Over the objections of the Defendants, the court gave the Sixth Circuit Pattern Jury Instruction 9.04.[3]

---

2. 18 U.S.C. § 242 provides:
   Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State, Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the citizens, shall be fined not more than $1000 or imprisoned not more than one year, or both; and if bodily injury results shall be fined under this title or imprisoned not more than ten years, or both; and if death results shall be subject to imprisonment for any term of years or for life.
   18 U.S.C. § 2 provides:
   (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
   (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principle.

3. Sixth Circuit Pattern Jury Instruction 9.04 for a deadlocked jury provides as follows:

   (1) Members of the jury, I'm going to ask that you return to the jury room and deliberate further. I realize that you're having some difficulty reaching unanimous agreement, but that's not unusual, and sometimes after further discussion, jurors are able to work out their differences and agree.
   (2) Please keep in mind how very important it is for you to reach unanimous agreement. If you cannot agree and if this case is tried again, there is no reason to believe that any new evidence will be presented or that the next 12 will be any more conscientious and impartial than you are.
   (3) Let me remind you that it is your duty as jurors to talk with each other about the case, to listen carefully and respectfully to each other's views and to keep an open mind as you listen to what your fellow jurors have to say. And let me remind you that it is your duty to make every reasonable effort you can to reach unanimous agreement. Each of you, whether you are in the majority or the minority, ought to

■ Defendants claim that the charge improperly coerced the jury into returning a verdict. We review a district court's decision to give an *Allen* charge for abuse of discretion, *United States v. Cochran*, 939 F.2d 337, 340 (6th Cir.1991), *cert. denied*, 502 U.S. 1093, 112 S.Ct. 1166, 117 L.Ed.2d 413 (1992), and hold that no such abuse occurred in this case.

■ Defendants cite as evidence of the charge's coercive effect, the speed at which the jury arrived at a verdict after the charge was given. This court has explicitly rejected the notion that an *"Allen* charge may or may not be considered coercive depending upon the speed with which a verdict is reached." *United States v. Giacalone*, 588 F.2d 1158, 1167 (6th Cir.1978), *cert. denied*, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979). The time it took the jury to return the verdict is therefore irrelevant.

■ Defendants also contend that the charge was given at an inappropriate time in the trial. We find no merit in the Defendants' claim that the charge was given too soon after the jury reached a deadlock. The timing of an *Allen* charge is left to the trial judge's sound discretion. *United States v. Sawyers*, 902 F.2d 1217, 1220 (6th Cir.1990). In this case, the district court gave the charge as soon as the jury announced its deadlock, which is typically the time the charge is given. *See Sawyers*, 902 F.2d at 1220 (holding court within its discretion to give *Allen* charge when jury announced a deadlock after three hours of deliberation), *cert. denied*, 501 U.S. 1253, 111 S.Ct. 2895, 115 L.Ed.2d 1059 (1991); *United States v.*

*Clark*, 988 F.2d 1459, 1469 (6th Cir.) (holding *Allen* charge appropriate when given 50 minutes after jury announced a deadlock two days into deliberations), *cert. denied*, —— U.S. ——, 114 S.Ct. 105, 126 L.Ed.2d 71 (1993). In fact, this court has determined that the possibility of coercion is reduced if the charge is given early rather than after days of deadlocked deliberations. *See Sawyers*, 902 F.2d at 1220. We conclude that the district court did not abuse its discretion in the timing of the *Allen* charge to this jury.

■ Defendants' remaining evidence of coercion is the affidavit of juror Rosie McGlothen that attempts to explain the effect of the charge on the jury. Federal Rule of Evidence 606(b), which prohibits the use of a juror's statement to impeach the verdict, precludes our consideration of these statements. *United States v. Thomas*, 946 F.2d 73, 76 (8th Cir.1991). A detailed discussion of Rule 606(b) issues in this case will follow in the discussion of the denial of Defendants' motion for a new trial.

■ When a party objects to jury instructions, we will reverse "only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 73 (6th Cir.1990) (citing *Kitchen v. Chippewa Valley Schs.*, 825 F.2d 1004, 1010–11 (6th Cir.1987)). Viewed as a whole, the court's instructions to this jury were neither coercive nor prejudicial. The *Allen* charge asked both those in the minority and the majority to reconsider the views of others. There was no charge for one side to change its mind.

seriously reconsider your position in light of the fact that other jurors, who are just as conscientious and impartial as you are, have come to a different conclusion.

(4) Those of you who believe that the government has proved the defendant guilty beyond a reasonable doubt should stop and ask yourselves if the evidence is really convincing enough, given that other members of the jury are not convinced. And those of you who believe that the government has not proved the defendant guilty beyond a reasonable should stop and ask yourselves if the doubt you have is a reasonable one, given that other members of the jury do not share your doubt. None of you should hesitate to change your mind, if after, reconsidering things, you are convinced that

other jurors are right and that your original position was wrong.

(5) But remember this. Do not ever change your mind just because other jurors see things differently, or just to get the case over with. As I told you before, in the end, your vote must be exactly that—your own vote. As important as it is for you to reach unanimous agreement, it is just as important that you do so honestly and in good conscience.

(6) What I have just said is not meant to rush or pressure you into agreeing on a verdict. Take as much time as you need to discuss things. There is no hurry.

(7) I would ask that you now return to the jury room and resume your deliberations.

Further, the court reinstructed the jury on reasonable doubt in conjunction with the charge, and soon after giving the *Allen* charge also instructed the jury that it could return a partial verdict. Because the jury instructions, viewed as a whole, were not confusing, misleading, or prejudicial, we affirm the district court's use of the *Allen* charge in this case.

## V.

Defendants next appeal the district court's decision to read back of the full testimony of one witness upon the jury's request. After the court gave the *Allen* charge, the jury asked to hear testimony of deputy jailer John Littles again. The court asked the jury if it would like to hear Littles' entire testimony, and the foreman responded "[y]es, in that I'm not sure where a relevant point may or may not be." J.A. at 1005. Defendants objected to this request on the ground that reading the entire direct and cross examinations would cause the jury to place undue emphasis on Littles' testimony. Defendants asked the court to respond only to narrow requests for specific excerpts of Littles' testimony. The court overruled these objections and ordered the court reporter to read the jury a transcript of Littles' entire testimony. Both before and after the testimony was re-read, the court gave the jury an instruction not to place undue weight on Littles' testimony. After hearing Littles' testimony the second time, the jury deliberated for approximately six more hours before returning its partial verdict.

This court has left to the trial court's discretion whether to grant or deny a jury's request to hear a portion of the trial transcript. *United States v. Thomas,* 875 F.2d 559, 562–563 n. 2 (6th Cir.), *cert. denied,* 493 U.S. 867, 110 S.Ct. 189, 107 L.Ed.2d 144 (1989). This discretion encompasses a trial court's decision to allow a re-reading of one witness' entire testimony. *See United States v. Epley,* 52 F.3d 571, 579 (6th Cir.1995). Nevertheless, after a jury reports an inability to reach a verdict, when a trial court permits any evidence to be restated or re-read to jurors, it must avoid two dangers: (1) that the jury may unduly emphasize the tes-

timony, and (2) that the jury may take the reviewed testimony out of context. *Epley,* 52 F.3d at 579; *United States v. Padin,* 787 F.2d 1071, 1076 (6th Cir.1986).

We find nothing lacking in the measures undertaken by the district court to avoid the dangers mentioned in *Epley* and *Padin.* In rejecting Defendants' request to limit the scope of the read-back, the court cited concerns that asking the jury to focus its request would "cause them to narrow and emphasize within the testimony." J.A. at 1049. The court sought to avoid this result since the jury did not know what part of Littles' testimony would be relevant. J.A. at 1051. *See Epley,* 52 F.3d at 579. Furthermore, to guard against the dangers of undue emphasis and context, the court gave a cautionary instruction explaining how the jury was to regard the re-read testimony. Twice before and once after the testimony was re-read, the judge instructed the jury:

> I caution you ... that just because you have been allowed to have testimony read back, you must not put any undue emphasis on that testimony, but must treat it as you treat the testimony of all the witnesses who have testified in the case. I further caution you that you must keep the testimony that you have read back in the context in which it was given during the trial. You may not isolate that testimony from the testimony of other witnesses.

J.A. at 1042–43, 1056–57, 1134. *See Epley,* 52 F.3d at 579.

The Defendant's contend, however, that despite the court's instructions, an exchange between the United States Attorney and the court during closing arguments would lead the jury to overemphasize Littles' testimony. During closing argument, counsel for the government said to the jury "if you need it, you can have [testimony] read back." J.A. at 987. The judge interrupted with the statement: "[I]'m not sure about that; [w]e normally don't read anything back." *Id.* Defendants argue that after hearing this statement from the court, the jury would see its request to have testimony re-read as an exception to normal procedure and consequently the jury would place undue emphasis on the testimony.

In light of the court's instruction, given three times after closing arguments, we conclude this exchange would not lead the jury to evaluate improperly the re-read testimony. We presume the jury followed the court's instructions, *Zafiro v. United States,* 506 U.S. 534, 540–41, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993), and we are convinced that the district court's explicit instructions on this matter averted any danger that the jury would unduly emphasize the witness' testimony.

## VI.

Defendants Bridgeforth and Marshall appeal the district court's denial of a motion for a new trial, claiming that the court's failure to investigate allegations of juror misconduct resulted in a violation of their Sixth Amendment rights to trial by a panel of impartial, disinterested jurors. Defendants filed a motion for a new trial, based on allegations of juror misconduct outlined in the affidavit of Juror McGlothen. The court denied the motion and the accompanying requests to hold an evidentiary hearing on the alleged misconduct.

In denying the motion, the district relied in large part on Federal Rule of Evidence 606(b), which provides in relevant part:

Upon an inquiry into the validity of a verdict ... a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed.R.Evid. 606(b). The district court concluded that the affidavit of Rosie McGlothen did not provide any evidence of extraneous prejudicial information or outside influence and therefore was excluded by Rule 606(b). J.A. at 184–85. On appeal, Defendants argue that the district court should have viewed the *Allen* charge as the outside influence which was improperly brought to bear upon the jury. Defendants' contention is without merit.

A jury's interpretation and application of the court's instructions is a part of the deliberative process and was correctly excluded under Rule 606(b). *See generally Peveto v. Sears, Roebuck & Co.,* 807 F.2d 486, 488 (5th Cir.1987); *Woods v. Bank of New York,* 806 F.2d 368, 373 (2d Cir.1986). How the jury interprets an *Allen* charge to come to a verdict is no exception to this principle. *United States v. Wickersham,* 29 F.3d 191, 194 (5th Cir.1994).

The trial court is in the best position to determine the nature and extent of alleged jury misconduct, and we review its determinations of the scope of proceedings necessary to discover misconduct for abuse of discretion. *United States v. Shackelford,* 777 F.2d 1141, 1145 (6th Cir.1985), *cert. denied,* 476 U.S. 1119, 106 S.Ct. 1981, 90 L.Ed.2d 663 (1986). *See also Tanner v. United States,* 483 U.S. 107, 127, 107 S.Ct. 2739, 2751, 97 L.Ed.2d 90 (1987). Because the allegations in this case involve matters that were strictly within the deliberative process, the court did not err in refusing to hold a hearing on Defendants' proffered affidavit.

## VII.

Defendants Bridgeforth and Marshall appeal the district court's decision to grant the government's motion *in limine* to exclude evidence of the prior inmate violence at the jail. We will not disturb a trial court's determinations as to the admissibility and relevancy of evidence absent a clear abuse of discretion. *United States v. Seago,* 930 F.2d 482, 494 (6th Cir.1991).

The court admitted this evidence in the first trial because as one of their defenses, Defendants claimed they were using reasonable force to subdue the violent inmates. The evidence of recent inmate violence was

relevant to prove the Defendants' state of mind and to justify the actions they took against the inmates. In the second trial, none of the Defendants claimed such a defense; each argued he or she was not present or did not assault the inmates. J.A. at 925. Accordingly, the district court concluded that the evidence of recent violence was not probative of any issue related to the Defendants' present theory of the case. J.A. at 926.

The district court did not abuse its discretion by excluding this evidence. The court ruled narrowly, excluding the evidence only for the purpose of proving state of mind. Although the Defendants claim the ruling prevented them from using the evidence for its impeachment value, the court explained to Defendants that evidence regarding past prison violence might be admitted for its impeachment value if it became relevant for such a purpose. Tr. Vol. II at 211. The record reflects no attempt by Defendants to introduce this evidence for impeachment purposes after the court's initial ruling. Defendants contentions are simply inconsistent with the record of this case. Therefore, we affirm the district court's ruling on the government's motion *in limine*.

## VIII.

Finally, Defendants Bridgeforth and Marshall claim that the evidence presented in the trial was insufficient to support their convictions. Finding the evidence sufficient to support the jury's verdict, the trial court denied Defendants' motions for acquittal. We agree with the ruling of the district court.

█ We review claims of insufficient evidence in the following manner:

The relevant inquiry when reviewing claims of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Circumstantial evidence and direct evidence are accorded the same weight and "the uncorroborated testimony of an ac-

complice may support a conviction under federal law." *United States v. Frost,* 914 F.2d 756, 762 (6th Cir.1990) (quoting *United States v. Gallo,* 763 F.2d 1504, 1518 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986)). Therefore, we will reverse a judgment for insufficiency of evidence only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence. *[United States v.] Ellzey,* 874 F.2d [324,] 328 [ (6th Cir.1989) ].

*United States v. Blakeney,* 942 F.2d 1001, 1010 (6th Cir.1991), *cert. denied,* 502 U.S. 1035, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992).

█ As the district court pointed out, there was both direct and circumstantial evidence to support guilty verdicts for Marshall on counts four through seven and for Bridgeforth on count four. Several eyewitnesses testified that Marshall gathered the officers for the purpose of beating the inmates. These witnesses also testified that Marshall gave the officers the stun guns that they used in the beatings. Marshall was also seen in the control room during the beatings of the inmates relating to the counts on which she was found guilty. The government presented evidence that Bridgeforth was at the scene of the beatings. One of the inmates testified that he saw Bridgeforth strike inmate Owens with a riot baton. The jury found Bridgeforth guilty of the count that named Owens as the victim. J.A. at 176.

Viewing the evidence in the light most favorable to the government, we conclude that a rational juror could find the evidence sufficient beyond a reasonable doubt to find Marshall guilty of counts four through seven and Bridgeforth guilty of count four. Accordingly, the district court did not err in denying the motion for judgment of acquittal.

## IX.

The district court did not err in any of the respects alleged by the Defendants. We AFFIRM the Defendants' convictions.