*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0315p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v,

AHMED BRIKA,

*Defendant-Appellant.*

Nos. 02-4329; 04-3982

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 01-00126—Algenon L. Marbley, District Judge.

Argued: May 31, 2005

Decided and Filed: July 27, 2005

Before: BOGGS, Chief Judge; GILMAN, Circuit Judge; and CLELAND, District Judge.[*]

---

## COUNSEL

**ARGUED:** Kevin M. Schad, SCHAD & COOK, Indian Springs, Ohio, for Appellant. Kevin W. Kelley, UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee. **ON BRIEF:** Kevin M. Schad, SCHAD & COOK, Indian Springs, Ohio, for Appellant. Kevin W. Kelley, Salvador A. Dominguez, UNITED STATES ATTORNEYS, Columbus, Ohio, for Appellee.

---

## OPINION

BOGGS, Chief Judge. Defendant-Appellant Ahmed Brika was tried for conspiracy to commit a kidnapping offense and for using a telephone to extort money in exchange for the release of a kidnapped person. The jury found him guilty of the second offense, but was unable to reach a verdict on the first, as to which the judge declared a mistrial. He was then sentenced to twenty years in prison. Brika appeals his conviction and sentence, claiming that: (1) the judge improperly instructed the jury; (2) venue was improper; (3) the judge erred in refusing to admit documentary evidence that Brika offered and in permitting the Government to use documentary evidence to impeach a defense witness on cross-examination; (4) the judge erroneously failed to hold a hearing to decide a factual dispute over the contents of the record; and (5) the judge's use of his own factual findings under the United States Sentencing Guidelines (USSG) as a basis

---

[*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

for mandatory enhancement of Brika's sentence was unconstitutional. We affirm the conviction but vacate the sentence and remand for resentencing.

# I

Mohammed Bousfiha, the kidnapping victim, came to the United States from his native Morocco in 1988, becoming an American citizen in 1995. He settled in Columbus, Ohio, where he was joined by his four brothers. Within several years of his arrival, Mohammed had started his own business, running first a group of parking lots and later leasing gas stations from BP. Some of his brothers were also involved in his business ventures.

In the late 1990s, Mohammed married Latifa Brika, a Moroccan citizen who is the sister of Defendant Ahmed Brika. The couple separated in 1999 and divorced in 2000. During their marriage, however, Defendant Brika would spend a great deal of time at Mohammed's home and businesses. The Bousfihas testified that while Mohammed was married to Latifa, Brika sometimes lived with the couple for weeks at a time. They also testified that Mohammed gave Brika money and sent him to "BP School," a five-day program run by BP for prospective owners of BP gas stations. Furthermore, according to the Bousfiha brothers, Brika held no job during this period, and he never owned a gas station. However, according to the testimony of Brika's friends and relations, Brika only lived with Mohammed for one week, he received little or no money from the Bousfihas, and he bought the BP station from Mohammed and operated it for approximately one year.

On June 4, 2001, Mohammed, who was visiting Morocco, was kidnapped and held for over a week in a remote location by a group of Moroccan kidnappers. He claims that on the second day of his captivity, Brika, whom he recognized only by voice because he was blindfolded, came to where he was being hidden and threatened him. The same day Brika, who had also been visiting Morocco, left the country and returned to the United States.

Beginning on June 7, 2001 and continuing for the duration of Mohammed's captivity, the Bousfiha brothers received multiple phone calls from both the kidnappers in Morocco and Brika in Milwaukee. The kidnappers and Brika demanded $312,000 for Mohammed's release, representing the sum Brika claims Mohammed owed him. Following the advice of the FBI, the Bousfihas told the kidnappers and Brika that they had raised the money. Brika arranged for one of the Bousfiha brothers to drive to Indiana to deliver the cash. Immediately after the exchange was made, the FBI captured Brika. When the kidnappers did not hear from Brika, they grew anxious. The Bousfihas convinced them that Brika had taken the money and absconded and was not going to pay them. The kidnappers thereupon negotiated a separate ransom of $35,000 for Mohammed and released him on June 13.

A two-count indictment charged Brika with conspiracy to commit a kidnapping offense, in violation of 18 U.S.C. § 1203, and with using a telephone to extort money in exchange for the release of a kidnapped person, in violation of 18 U.S.C. § 875. At trial, the defense portrayed Brika as an opportunist who heard about the kidnapping and took advantage of it to try to get the Bousfihas to pay a debt that he alleged Mohammed owed to him. The strategy was apparently successful, because the jury hung on the conspiracy charge. The jury's inability to arrive at a verdict caused the judge to deliver two *Allen* charges during the four days of deliberation.

In addition, during jury deliberations, the jury sent the judge numerous questions. Rather than bring the jury back into the courtroom each time, the judge, after consultation with counsel about his instruction and with their permission to use this approach, would go into the jury room with the court reporter and instruct the jury. Counsel never objected to this procedure.

Brika was found guilty on the second count, using a telephone to extort money, and the judge declared a mistrial on the first count, conspiracy to kidnap. In this timely appeal, Brika makes six arguments. He first challenges the district judge's modification of the standard *Allen* charge, claiming that

the modified charge was coercive. Second, he asserts that the judge's instruction of the jury in the jury room violated his right to be present and his right to be represented by counsel during a critical stage of the trial. Third, Brika argues that venue was improper in the Southern District of Ohio because he made all of the extortionate phone calls not only outside that district but even outside Ohio. Fourth, he objects to the judge's decision to disallow, on the grounds of lack of foundation, evidence he offered, yet to allow evidence offered by the prosecution to impeach a defense witness during cross-examination. Next, he contends that the judge erred in not holding an evidentiary hearing to decide a factual dispute about an omission in the record. Last, he objects to the use of a USSG cross-reference and other enhancements not found by the jury to increase his sentence.

## II

An *Allen* charge is a supplementary instruction given to a deadlocked jury to try to move it toward unanimity. *United States v. Allen*, 164 U.S. 492, 501-02 (1896). Brika claims that the judge twice gave improperly and prejudicially modified *Allen* charges to the jury: once *informally* when he went into the jury room to speak to the jurors, and a second time when he brought the jury into the courtroom and gave a *formal* charge. These charges raise slightly different questions, and need to be evaluated under different standards of review, so they will be treated separately, beginning with the formal charge.

Courts usually review the decision to give an *Allen* charge for abuse of discretion. *United States v. Frost*, 125 F.3d 346, 373 (6th Cir. 1997). However, Brika does not appeal the decision to give the charge, but only the language used. While Brika's attorney did "generally resist[] the delivery of [the formal] *Allen* Charge," *United States v. Giacalone*, 588 F.2d 1158, 1167 (6th Cir. 1978), he neither made a formal objection to the decision to give the charge, nor did he object to the modifications the judge made to the content of the charge, even after the judge asked for objections. Under this circumstance, we review for plain error. *Ibid.*; *United States v. Clinton*, 338 F.3d 483, 487 (6th Cir. 2003) (reviewing modifications made to the standard text of the charge for plain error because "there was no objection to the *Allen* charge at trial"); Fed. R. Crim. P. 52(b). The court will reverse for plain error only if it determines "(1) that an error occurred, (2) that it was plain and (3) so seriously affected the defendant's substantial rights (4) that it called into question the fairness, integrity, or public reputation of the proceedings." *Clinton*, 338 F.3d at 487. A modified *Allen* charge is erroneous if, "'in its context and under all the circumstances, [the charge] . . . was coercive.'" *United States v. Aloi,* 9 F.3d 438, 443 (6th Cir. 1993) (quoting *Williams v. Parke*, 741 F.2d 847, 850 (6th Cir. 1984) (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965))).

The judge twice called the jury into the courtroom and gave it a formal *Allen* charge. On the afternoon of the second full day of jury deliberation, the jury sent its second note of the day to the judge indicating lack of unanimity on Count 1, the conspiracy charge. The judge then brought the jury into the courtroom and delivered an *Allen* charge that exactly followed Sixth Circuit Pattern Jury Instruction § 9.04 (1991 ed.).[1] Neither counsel objected to this charge.

---

[1]The Pattern Jury Instruction for an *Allen* charge reads as follows:

(1)  Members of the jury, I am going to ask that you return to the jury room and deliberate further. I realize that you are having some difficulty reaching unanimous agreement, but that is not unusual. And sometimes after further discussion, jurors are able to work out their differences and agree.

(2)  Please keep in mind how very important it is for you to reach unanimous agreement. If you cannot agree, and if this case is tried again, there is no reason to believe that any new evidence will be presented, or that the next twelve jurors will be any more conscientious and impartial than you are.

(3)  Let me remind you that it is your duty as jurors to talk with each other about the case; to listen carefully and respectfully to each other's views; and to keep an open mind as you listen to what your fellow jurors have to say. And let me remind you that it is your duty to make every reasonable effort you can to reach unanimous agreement. Each of you, whether you are in the majority or the minority, ought to seriously reconsider your position in light of the fact that other jurors, who are just as conscientious and impartial as you are, have come to a different conclusion.

(4)  Those of you who believe that the government has proved the defendant guilty beyond a reasonable doubt should stop and ask yourselves if the evidence is really convincing enough, given that other members of the jury are not convinced. And those

The following day, shortly before lunch and in response to another note from the jury indicating that it was "hung" and that certain jurors felt "their conscience will [not] allow them" to change their votes, the judge brought the jury into the courtroom and gave a second formal *Allen* charge. This time, however, he modified the charge in two ways. First, he added a preamble to the charge as follows:

> I am going to emphasize to you this is a modified *Allen* charge because I am going to break what is set forth by the instructions and emphasize that neither the Court nor any of the parties to this case wish you to reach any kind of compromise verdict. We all would reiterate that you have to make your verdict your verdict and that we don't expect nor would the Court have you trade votes or compromise just for the sake of having it over. So we're not in any way in our discussions trying to get you to reach a compromise verdict. The Court would not have you reach a compromise verdict, just a verdict based on the facts as you find them and on the law applicable to those facts. But I am going to read for the record the *Allen* charge once again.

Between sections 4 and 5 of the Pattern Jury Instruction, the judge added an extensive commentary of his own:

> Ladies and gentlemen, let me say one other thing about that: Often, after a long period of deliberation, the message gets lost in the messenger. And what I want you to avoid as jurors is getting caught up in who is taking the position as opposed to the position itself. You have to look at and analyze the position itself, whether supported by the evidence or not supported by the evidence, and not draw the lines along personality lines.
>
> So that if at some point during your deliberations, discussions have become heated between individuals, we don't want you as individuals to harbor resentment which would interfere with your ability to analyze and to assess, consistent with your duty as jurors, the evidence in the case.
>
> As the old expression goes, don't slay the messenger. Listen to the message and see whether you agree or disagree with the message and don't look at it as to whether you necessarily agree or disagree with this person. I think that is going to be key in further deliberations: Listen to what is being said, not so much in who is saying it. So be mindful of that and keep that uppermost in your mind when you return to deliberate and reevaluate your positions. And don't reevaluate it in terms of who is taking a particular position but reevaluate it strictly on the merits. This is a merit based determination that you have to make, ladies and gentlemen. You have to find the facts from the record, and that's it, and then apply the law as I have given it to you to those facts. But do not be concerned with who has taken a position on a relative issue, but just look at the positions that are being taken.

Although prior to the instruction, defense counsel objected in a rather tentative way to the giving of a second *Allen* charge and asked that the judge declare a mistrial,[2] neither counsel objected to the content of the

---

of you who believe that the government has not proved the defendant guilty beyond a reasonable doubt should stop and ask yourselves if the doubt you have is a reasonable one, given that other members of the jury do not share your doubt. None of you should hesitate to change your mind if, after reconsidering things, you are convinced that other jurors are right and that your original position was wrong.

(5)  But remember this. Do not ever change your mind just because other jurors see things differently, or just to get the case over with. As I told you before, in the end, your vote must be exactly that--your own vote. As important as it is for you to reach unanimous agreement, it is just as important that you do so honestly and in good conscience.

(6)  What I have just said is not meant to rush or pressure you into agreeing on a verdict. Take as much time as you need to discuss things. There is no hurry.

(7)  I would ask that you now return to the jury room and resume your deliberations.

[2] The Defense counsel's most direct statement in opposition to the second charge was: "I understand the reasoning in what you [the judge] are saying, but I still stand by my original position that I think it's time to send them home."

charge when the judge offered them the opportunity to do so after giving the charge. Furthermore, in the colloquy between the judge and counsel prior to the giving of the charge, the judge quite explicitly told counsel the modifications he intended to make:

> My inclination is to give them one more modified *Allen* charge, basically to emphasize to them that they are not to reach a compromise verdict. They are not to trade votes or anything like that. I just wanted them to make sure that they have looked at all of the facts from all angles and given due consideration to the merits of the various arguments and positions that have been taken within the jury. We all know what happens here is at a certain point it becomes personalities. "I am not going to go along with that person because that person was unreasonable. She shouted at me when we were talking. I am just not going to agree with her at that point." But what I would like for them to do is step back from that and review and examine within themselves what the other side is saying just on the merits.

Neither side objected to anything the judge proposed to say, even though the discussion about whether or not to give a second *Allen* charge was fairly lengthy.

Because of lingering questions about the inherent coerciveness of the *Allen* charge, most circuits, including this one, have either required or expressed a strong preference that judges stick closely to the pattern instruction approved by the circuit. *See*, *e.g.*, *Clinton*, 338 F.3d at 488 ("[W]hile we have generally approved use of the Sixth Circuit Pattern Instruction, we have never explicitly mandated the use of that or any instruction to the exclusion of others. We decline to do so now, although we take the occasion to express a strong preference for the pattern instruction . . . ."); *United States v. Scott*, 547 F.2d 334, 337 (6th Cir. 1977) ("Any variation upon the precise language approved in *Allen* imperils the validity of the trial."). When a trial judge does change the wording, the appellate court must consider whether the charge as given "'include[d] all those elements of the original charge designed to ameliorate its coercive effect, and . . . avoid[ed] language which might heighten it.'" *Scott*, 547 F.2d at 337 (quoting *United States v. Flannery*, 451 F.2d 880, 883 (1st Cir. 1971)).

We find that the modifications the judge made to the Pattern Instruction in this case only served to ameliorate further any potential coercive effect and that, therefore, the judge did not err. A review of the case law clearly indicates what may and may not appear in a modified *Allen* charge if it is to avoid becoming unconstitutionally coercive. First, the charge must include "the reminder that no juror should merely acquiesce in the majority opinion." *Scott*, 547 F.2d at 337. Second, the judge may not instruct the jury that it is required to agree. *Jenkins*, 380 U.S. at 446; *Williams*, 741 F.2d at 850. Third, the instruction must "direct[] both majority and minority jurors to reconsider their positions . . . ." *United States v. Frost*, 125 F.3d 346, 374-75 (6th Cir. 1997) (calling this "language which this circuit has identified as critical to any *Allen* charge"); *United States v. Tines*, 70 F.3d 891, 896 (6th Cir. 1995). Fourth, the judge cannot tell the jury that they are the only ones who can decide the case. *Jones v. Norvell*, 472 F.2d 1185, 1185 (6th Cir. 1973). Fifth, the judge may not ask the jury to consider the external effects of their inability to reach a verdict, *e.g.*, delay to other litigants caused by having to retry the case. *Scott*, 547 F.2d at 337. Finally, the reviewing court should consider whether the modifications to the *Allen* charge, when "viewed as a whole, were . . . confusing, misleading, or prejudicial." *Tines*, 70 F.3d at 896.

The modified charge the judge gave in Brika's case did not violate any of these strictures. If anything, the judge took extra pains in his preamble to remind the jurors that they must not compromise their votes, and his petition that the jurors not let themselves be swayed by their personal feelings for other jurors would seem to have been a useful reminder to the jury to decide on the facts, rather than a coercive order to reach a unanimous verdict quickly. This language was merely an accessible explanatory expansion of the Pattern Instruction's charge "to listen carefully and respectfully to each other's views; and to keep an open mind as you listen to what your fellow jurors have to say." *See Giacalone*, 588 F.2d at 1166 (upholding language that "roughly follows" the Pattern Instructions). The judge's additions were not confusing or misleading–they used common language and metaphors; and they were not prejudicial to one

or the other party. Furthermore, the jury was not coerced by the second *Allen* charge into changing its mind. While it is, of course, conceivable that, had the judge merely stuck by the Pattern Instructions, the jury would have returned a verdict of not guilty, the fact that the jury remained deadlocked, as it had been already for at least a day prior to receiving the charge, is strong evidence that its members were not intimidated into changing their votes by the judge's admonition not to "slay the messenger." Therefore, it cannot be said that the modified formal *Allen* charge erroneously coerced the jurors.

Next, Brika argues that the judge informally gave another modified *Allen* charge when he went into the jury room and told the jurors:

> I would say that I am heartened that you sent the Court that note because I would otherwise give you the same charge that I gave you when I called you back in. And that is called an Allen for your information, named after the case from which it came, and that is what the Court would give you. And I would ask you, as you break over the evening to consider what the Court read to you in the last charge about trying to reach unanimity on the verdict.

The propriety of addressing the jurors in the jury room will be considered below. Here, the only question is whether this instruction constitutes an *Allen* charge. As the judge had not previously cleared these comments with counsel, and as counsel did not learn of them afterward, counsel cannot be faulted for having failed to object, and we review for abuse of discretion.

An *Allen* charge is sometimes also provocatively called a "dynamite charge" because the instruction intends to "blast" a deadlocked jury toward rendering a unanimous verdict. *Clinton*, 338 F.3d at 487. In speaking to the jury here, the judge made a one-sentence request that they bear in mind the instruction he had given them two or three hours earlier, which he described as the "charge about trying to reach unanimity on the verdict." We do not believe that this simple reminder rose to the level of an *Allen* charge, modified or not. While the judge's comment was less than ideal, merely asking the jury to bear in mind the charge that was given to them earlier that afternoon was neither coercive nor even independently instructive,[3] and it did not amount to abuse of discretion.

### III

Brika claims that the district judge erred in interacting with the jury in the jury room, outside the presence of counsel and the Defendant. These actions, he contends, violated his right to assistance of counsel and his right to be present during trial. Brika did not object to this interaction during trial, so we review the claim for plain error.

Normally, when the judge instructs the entire jury, the preferred method is to bring the jury into the courtroom and to instruct it in the presence of opposing counsel and the defendant. *United States v. Bustamante*, 805 F.2d 201, 203 (6th Cir. 1986); *accord United States v. Combs*, 33 F.3d 667, 670 (6th Cir. 1994). Courts also allow a limited, but not preferred, exception to the presence rule, in which the judge,

---

[3]Compare this to the instruction given in a recent unpublished case, *Bhat v. University of Cincinnati*, 23 F. App'x 280 (6th Cir. 2001), in which the Appellant contended that the judge gave a juror a "partial *Allen* charge" when he told a single dissenting juror:

> Well, if you're not in agreement with the verdict, then I think you should go back to the jury room and revisit the issues, discuss further with your fellow jurors what your respective positions are. I have not had any indication from any other member of the jury or from the foreman that your deliberations are at impasse. So I think you should go back to the jury room and continue your deliberations until you can either reach a verdict, or you are satisfied that you can't.

*Id.* at 284. Although the opinion did not address the question of whether this statement actually constituted an *Allen* charge, noting only that it "included some of the language" of that charge, we held that the statement was not coercive, even though it was given to the sole hold-out juror after the verdict had been signed and published and the juror had changed her vote when polled. *Id.* at 290.

after consultation with opposing counsel and after giving them the opportunity to object, provides the jury with written instructions. *Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76, 81 (1919).

In this case, the jury sent the judge eleven questions over the course of four days of deliberation. Each time he received a question, the judge would convene counsel for both sides, read them the question, explain the answer he intended to give, ask for counsel's input, tell counsel his final decision, give counsel the opportunity to object, and then ask counsel if he should bring the jury into the courtroom or if he should answer the question in the jury room. If one counsel suggested that the judge go into the jury room, the judge asked for objections. Neither counsel ever objected to the judge speaking with the jury in the jury room. Indeed, counsel for the Defendant occasionally advocated this procedure, saying, for instance, that he didn't think the jury "need[ed] to be paraded into the courtroom anymore." The judge thereupon took the court reporter into the jury room and instructed the jury in person.

The judge appears to have spoken to the jury six times.[4] The first time, he read them a quotation from a case, by way of explanation. Both counsel had approved this particular text. The second time, the judge told the jurors they could recess and reminded them not to talk about the case. The third time, he reread instruction number 21. He had previously told counsel this was what he would do, and they did not object. The fifth time, the judge reread the jury part of instruction number 21, and read it two brief additions to instruction number 24, with approval of counsel. The judge also commented:

> The Court also brought a revised instruction No. 24 and there are revisions in two sentences. And you will see them because they are in the Court's handwriting and that was in response to what we thought might help clarify this question that you submitted and I will leave that for you.
> I will again emphasize that you are not to take any one instruction as stating all of the law in the case and not overemphasizing one instruction to the neglect of all of the others; that the instructions are to be read as a whole.

The second paragraph repeats an instruction that counsel had agreed to when the judge spoke to the jury the third time. Each time he read an instruction, the judge carefully noted that counsel for both sides agreed to the instruction he was giving.

The fourth time the judge spoke to the jurors in the jury room, he first told them that they could recess, then asked them to bear in mind the *Allen* charge they had heard earlier. The judge had not informed counsel that he would make this comment about the *Allen* charge. The sixth and final time the judge met with the jury, he informed it that he intended to declare a mistrial on Count 1. The discussion in the jury room reads, in pertinent part:

> THE COURT:  Madame Foreperson, have you reached a unanimous verdict on Count 2? Don't tell me what it is.
>
> THE FOREPERSON:  Yes, we have.
>
> THE COURT:  Here is what the Court is going to do. I am going to declare a mistrial because the jury is hung with respect to Count 1. I will take your verdict on Count 2. What I will ask to you do [sic] is to complete the verdict form. When you have completed the verdict form, let Mr. Clark know, we will bring you into court and I will indicate that a mistrial is declared with respect to Count 1 because the jury

---

[4]Brika claims that the judge spoke to the jury in the jury room seven times, but the joint appendix only records six. Br. for Appellant at 19. Brika also claims that the judge "paraphrased" to the jury his discussions with counsel. *Id.* at 22. This is not accurate. According to the record, when the judge read the jury a text, it was always the same text he had discussed with counsel.

cannot reach agreement on it after having deliberated for four days and after having had two *Allen* and I will take your verdict on Count 2.

THE FOREPERSON:   I can't ask you a question?

THE COURT:   Not now.

THE FOREPERSON:   Can I ask a question in reference to the signing of the sheets if it's already done?

THE COURT:   Yes.

UNIDENTIFIED JUROR:   Will you explain what a mistrial is?

THE COURT:   It's just that; it is simply a device that the Court will use to declare the trial over because you can't agree on that count.  So that count can be tried over.  And the count on which you have reached agreement, of course, will not.

Although the judge had previously discussed with counsel his intention to find out if the jury had reached a verdict on Count 2 and to tell them he would declare a mistrial if they had, he obviously had not discussed with counsel his intention to answer the juror's question.

Having established the relevant events, we look now to Brika's claims.  Assuredly, Brika had a constitutional right to be represented by counsel, and that right must be knowingly and intelligently waived by the defendant himself. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  The record does not demonstrate that Brika was ever asked whether he wanted his attorney present at all jury instructions.  However, we find that Brika *was* represented by counsel, and that counsel's decision to permit the judge to speak to the jury in the jury room was an invited error that did not result in prejudice to Brika. *See United States v. Macias*, 387 F.3d 509, 521 (6th Cir. 2004) ("'The doctrine of "invited error" refers to the principle that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to commit.'") (quoting *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 60 (6th Cir. 1991) (additional internal citations omitted)); *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002) ("'An attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course.'") (quoting *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990).

In *United States v. Cronic*, the Supreme Court held that "[t]he presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is **denied counsel** at a critical stage of his trial."  466 U.S. 648, 659 (1984) (emphasis added).  This court has twice in recent years held that reinstruction of the jury is a "critical stage" of the trial. *Caver v. Straub*, 349 F.3d 340, 350 (6th Cir. 2003); *French v. Jones*, 332 F.3d 430, 438 (6th Cir. 2003).  Therefore, Brika asks us to find that the absence of his counsel when the judge instructed the jury in the jury room was prejudicial.

However, because we hold that Brika was not denied counsel, the cases to which he draws our attention are distinguishable.  In *French,* 332 F.3d at 434, the judge brought the jury into the courtroom and instructed it in the presence of the prosecutor but not defense counsel and did so without first consulting counsel.  In *Caver*, 349 F.3d at 351-52, the judge wrote a note to send to the jury, but defendant's counsel was not present when the judge read the note to other counsel before sending it to the jury.  In two other cases, the judge instructed the jury in writing without first consulting counsel at all.  In these two latter cases, we found the judge in error but the error harmless. *Combs*, 33 F.3d at 670; *Bustamante*, 805 F.2d at 203.  Unlike in the conduct of Brika's trial, in none of the cited cases was counsel for the defendant given the opportunity to contribute to, discuss, or object to the proposed jury instructions.  Therefore, without either the presence of counsel or counsel's ability to advise and object to the intended jury instructions, these defendants suffered a total lack of meaningful advocacy. *Cf. Bell v. Cone*, 535 U.S. 685, 697 (2002).

Brika, however, did not suffer such a total lack, and we agree with our decision in *Hudson v. Jones* that where Defendant's counsel was afforded the opportunity to preview, argue about, and object to the judge's proposed jury instructions, the actual moment of instructing the jury does not constitute a critical stage of the trial. 351 F.3d 212, 217 (6th Cir. 2003); *see also United States v. Morrison*, 946 F.2d 484, 503 (7th Cir. 1991). Once Brika's attorney had heard and debated the proposed instructions and placed his objections on the record, and once he had satisfied himself that the judge would not go beyond the agreed upon instructions, he apparently believed that he had served his client's best interest both in terms of the text of the instruction and in terms of not aggravating the jurors by repeatedly forcing them to return to the courtroom. Defense counsel may have lost some opportunity to advocate when he allowed the judge to appear before the jury alone, but he seemed ready to balance that possibility against an interest in accommodating the jury. His willingness, after having had the opportunity to discuss and object to the proposed instruction, to permit the judge to instruct the jury face to face without being there to monitor the encounter, was a strategic decision of the sort that we are generally loath to second-guess. *See Howard v. Bouchard*, 405 F.3d 459, 481 (6th Cir. 2005) ("[T]rial counsel's strategic decisions are accorded strong deference."). Absent a complete denial of counsel, we will not now permit Brika to challenge his counsel's decision to agree to allow the judge to instruct the jury in the jury room.

With regard to the two statements that the judge made to the jury without forewarning counsel, our analysis is different. When the judge answered a juror's question about what a mistrial was *after* the jury had signed the verdict form on Count 2 and *after* the judge had informed them that he was going to declare a mistrial on Count 1, not only was he not instructing the jury in its deliberations, he was also not speaking to them during a critical stage of the trial because at that point nothing the judge said had any effect on the outcome of the trial. Therefore, we hold the judge committed no error in thus speaking to the jury outside the presence of counsel.

More problematic was the second impromptu statement, when the judge reminded the jury, while it was still deliberating, about the *Allen* charge he had given them that day. We recognize that the instruction of a jury in the midst of deliberation is a critical stage of the trial, and we note that the exception we discussed above to the presence of counsel applies only when counsel is given the opportunity to hear and object to the proposed instructions before the judge gives them. However, because the judge did no more than make a passing request that the jurors think about the *Allen* charge he had read them several hours earlier, we find that making this comment outside the presence of counsel, while perhaps ill-advised, did not rise to the level of error, and we also find that the absence of counsel at this point did not prejudice Brika. *Cf. Giacalone*, 588 F.2d at 1164 (finding no prejudice when judge responded, without consulting counsel, to jury's note stating it was deadlocked by sending in note reading, "Please continue your deliberations").

Next we turn to Brika's claim that he was denied his constitutional right to be present during a critical stage of the trial. A defendant has the right to be present at "every stage of the trial," which extends from the impaneling of the jury to the delivery of the sentence. Fed. R. Crim. P. 43(a); *United States v. Burke*, 345 F.3d 416, 422 (6th Cir. 2003). When the defendant is not confronting witnesses or evidence against him, however, this right is not absolute, but exists "'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.'" *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-106 (1934)). By contrast, "this privilege of presence is not guaranteed 'when presence would be useless, or the benefit but a shadow,'" but only when "'a fair and just hearing would be thwarted by his absence . . . .'" *Ibid*. (quoting *Snyder*, 291 U.S. at 106-07, 108).

The purpose of insisting on defendant's presence is to ensure that defendant can assist his counsel, and that he, by his presence in front of the jury, can act as a psychological brake on its deliberations. *Larson v. Tansy*, 911 F.2d 392, 395-96 (10th Cir. 1990); *United States v. Fontanez*, 878 F.2d 33, 38 (2d Cir. 1989); *Wade v. United States*, 441 F.2d 1046, 1050 (D.C. Cir. 1971). But where, as here, the judge did nothing more than give the jurors a technical and perfunctory rereading or explanation of previously-given jury

instructions, we fail to see how Brika's absence during the instructions in the jury room would have been more than a shadow benefit or how it thwarted a fair trial.  *See Hudson*, 351 F.3d at 217.  Furthermore, since only the judge was present, the jury could hardly have drawn prejudicial conclusions about Brika's absence.

"To be plain, an error must be conspicuous . . . ; but it must also be an error that probably changed the outcome of the trial . . . ."  *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir. 1984).  We do not advocate the judge's innovation of instructing the jury in the jury room, and we strongly caution that it is a procedure fraught with the potential for error and in particular that any deviation from the script of the jury instructions agreed to by counsel invites searching appellate scrutiny.  Nevertheless, in this case we are able to examine the record the judge made of his interactions with the jury, and we do not find that he erred in his instructions or that his choice of the means of instruction changed the outcome of the trial.

## IV

We find Brika's other assertions of error to be even less compelling.  We begin with his contention that venue was improper in the Southern District of Ohio.  We review *de novo* the district court's interpretation of the venue statutes, and we review for abuse of discretion the court's decision whether to dismiss for lack of venue.  *Kerobo v. Southwestern Clean Fuels, Corp.*, 285 F.3d 531, 533 (6th Cir. 2002).

Venue is proper in the district in which the crime was committed.  *See* U.S. Const. Art. III, § 2, Cl. 3 ("Trial shall be held in the State where the said Crimes shall have been committed"); Fed. R. Crim. P. 18 ("[T]he prosecution shall be had in a district in which the offense was committed."); *accord United States v. Crozier*, 259 F.3d 503, 519 (6th Cir. 2001).  Because venue may in certain cases be appropriate in more than one district, long-standing precedent in this circuit applies the substantial contacts test to determine appropriate venue.  *United States v. [Estel] Williams*, 788 F.2d 1213, 1215 (6th Cir. 1986); reaffirmed in *United States v. [Lee] Williams*, 274 F.3d 1079, 1084 (6th Cir. 2001).  That test "'takes into account a number of factors–the site of the defendant's act, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact finding . . . .'"  *Williams*, 788 F.2d at 1215 (quoting *United States v. Reed*, 773 F.2d 477, 481 (2d Cir. 1986)).  In addition, 18 U.S.C. § 3237(a) instructs that "any offense against the United States begun in one district and completed in another . . . , may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

Venue was proper in the Southern District of Ohio under both 18 U.S.C. § 3237(a) and the substantial contacts test.  Brika was convicted pursuant to 18 U.S.C. § 875.  Subsection (a) of that provision reads: "Whoever transmits in interstate or foreign commerce any communication containing any demand or request for a ransom or reward for the release of any kidnapped person, shall be fined under this title or imprisoned not more than twenty years, or both."  The second factor of the substantial contacts test requires consideration of the "elements and nature of the crime."  The elements of Brika's crime include the making of a phone call across state or national boundaries.  Thus, by definition, the crime is one that could not have been committed solely in the Southern District of Ohio, so the multi-district venue statute, 18 U.S.C. § 3237, applies.  The crime is also one in which the "locus of the effect of the criminal conduct" is to be found more in the district in which the call is received than in the district in which it is placed, meeting the third factor of the substantial contacts test.  *See Williams*, 788 F.2d at 1215, 1216-17 (considering the district in which "the detrimental effects" of the crime are "most strongly felt").  Finally, as the calls were received by the Bousfihas and recorded by the FBI from the phone in Mohammed's home, the Southern District is the most suitable district in which to carry out relevant fact-finding, thereby meeting the final factor of the substantial contacts test.  Thus we hold that the judge did not abuse his discretion in finding that venue was proper in the Southern District of Ohio.

Next, Brika asserts that the judge incorrectly disallowed admission of a document offered by the defense during the testimony of Latifa Brika and equally incorrectly allowed the prosecution to use another

document to cross-examine Latifa.  We review the district court's decision to permit or deny admission of evidence for abuse of discretion.  *United States v. Lucas*, 357 F.3d 599, 606 (6th Cir. 2004).

During its direct examination of Latifa Brika, the defense introduced Defense Exhibit 1 (henceforth "D-1"), a document that purported to be a business record recording deposits relating to the BP station that Mohammed Bousfiha owned.  The Government did not object to the introduction of this document and cross-examined Latifa on it.  Later, when the parties were discussing the admissibility of all of the exhibits, the Government objected to the admission of D-1 for lack of foundation.  The judge agreed after reviewing Latifa's testimony.  Brika argues that Latifa identified the handwriting as that of the person who leased the station from Mohammed, and that such an identification by a non-expert is sufficient foundation under Fed. R. Evid. 901(b)(2).  In response, the Government points out that the document is hearsay because its author did not testify and it was being offered for the truth of the matter asserted in it.  As such, it had to come in under a hearsay exception, the relevant one being the exception for regularly-kept business records, Fed. R. Evid. 803(6), an exception for which the defense did not provide an adequate foundation.

In fact, the defense did not provide any foundation at all for Exhibit D-1.  The defense introduced D-1 for the first time during its cross-examination of Mohammed Bousfiha.  Mohammed testified that he did not recognize the document, did not recognize the handwriting, and did not know what the figures in the document represented.  Later, Brika's attorney reintroduced D-1 during his direct examination of Latifa Brika, saying, "I want you to look at both pages and tell me if you have seen this before."  When she answered that she had, he asked her to explain the document.  Latifa said: "This was concerning the inventory and the money put in–the deposit of money for the gas and all the income from the BP gas station."  She also added, "This involved my brother Fouad [sic] and Fouad [the lessee of the station]."  This was the sum total of Latifa's direct examination testimony concerning the document. On *cross-examination* by the prosecution she admitted that she did not, in fact, know what the numbers on the document represented, and she only then identified the handwriting on the document as belonging to the lessee of the station.

The judge was correct in denying admission of this document, under any rule of evidence, because the proponent of the document did not lay a foundation for it.  Even if Latifa's identification of the handwriting were sufficient, and it is not sufficient to introduce the contents of a hearsay business record into evidence, *United States v. Mahar*, 801 F.2d 1477, 1493 (6th Cir. 1986), Brika, the proponent, did not elicit this testimony.  *United States v. Russo*, 480 F.2d 1228, 1241 (6th Cir. 1973); *see also United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999); *United States v. Robbins*, 197 F.3d 829, 838 (7th Cir. 1999); *United States v. Chang*, 207 F.3d 1169, 1176 (9th Cir. 2000) (all stating that the proponent of evidence has the burden of proof and must lay appropriate foundation).  As the defense did nothing to establish the reliability of its own exhibit, the judge did not abuse his discretion in denying the admission of D-1.

Brika further asserts that the judge abused his discretion in permitting the Government to impeach Latifa Brika during cross-examination with a document purporting to recount a statement she gave to the Moroccan police in the wake of Mohammed Bousfiha's kidnapping.  Brika likens this document to an FBI 302 report, in which the interviewing agent summarizes the contents of the interview.  Such documents have been deemed inadmissable for impeaching witnesses on cross-examination because they represent the "'investigator's selections, interpretations and interpolations.'"  *United States v. Nathan*, 816 F.2d 230, 236 (6th Cir. 1987) (quoting *Palermo v. United States*, 360 U.S. 343, 350 (1959)).

The document itself, translated by the court translator, is mostly written in the first person, allegedly in the voice of Latifa Brika, and is adopted and signed by her.  The last sentence reads: "After reading this report back to her, she agrees to its contents and therefore signs and we sign and our assistant signs."  Even if the report does not meet the American standards of a sworn statement, it is also clearly not equivalent to an FBI 302 report.  In addition, upon examination, Latifa acknowledged that she recognized the document as the statement she had given to the police.  If the document did represent a statement previously made by

Latifa, it was admissible for impeachment purposes under Fed. R. Evid. 613(a),[5] and Brika does not argue that the document was used for other than proper impeachment purposes.

As the document on its face, and based on the acknowledgment of Latifa Brika, appears to have been her prior statement, we find that the judge did not abuse his discretion by allowing the Government to use the statement to impeach her.

Brika also claims that the court erred by not holding an evidentiary hearing concerning a factual dispute about an alleged omission in the record. We review a refusal to hold an evidentiary hearing for abuse of discretion. *Alley v. Bell*, 307 F.3d 380, 389 (6th Cir. 2002).

According to Federal Rule of Appellate Procedure 10(e),

**(1)** If any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the record conformed accordingly.
**(2)** If anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded:
    **(A)** on stipulation of the parties;
    **(B)** by the district court before or after the record has been forwarded; or
    **(C)** by the court of appeals.

The rule does not require that the district court hold an evidentiary hearing, only that it consider and settle the dispute. When the court "settles a dispute about what occurred in proceedings before it, the court's determination is conclusive unless intentionally false or plainly unreasonable . . . because '[u]ltimately the [District] Court has direct knowledge of what the parties [stated in the] case and of what the Court's own general procedures are.'" *United States v. Hernandez*, 227 F.3d 686, 695 (6th Cir. 2000) (quoting *United States v. Barrow*, 118 F.3d 482, 488 (6th Cir. 1997)). Furthermore, the official transcript of a case is considered "prima facie a correct statement of the testimony taken and proceedings had." 28 U.S.C. § 753(b).

Brika claims that he noticed testimony missing from the official transcripts. He based this assertion on the recollection of a member of the audience at trial who says that she remembered hearing evidence that was not in the record. Brika's attorney submitted to the court affidavits from this audience member and from Brika himself to this effect. In response, the judge and the court reporter independently reviewed the transcript and listened to the recording. Both concluded that no testimony was missing.

Based on the fact that the same judge who presided at the trial also reviewed the record, *see Hernandez*, 227 F.3d at 695 (finding it particularly persuasive that "the same judge both presided over the trial and denied the Rule 10(e) motion"), that the record was recertified by the court reporter, and that the evidence Brika adduced was tenuous, we cannot find that the judge abused his discretion in refusing to hold an evidentiary hearing on Brika's motion to correct the record.

## V

Last, we turn to Brika's complaints about the series of sentencing enhancements applied by the judge using factual findings not made by the jury. The judge assigned Brika a four-level leadership enhancement under USSG § 3B1.1. He also enhanced the sentence based on his findings that Brika was criminally

---

[5]Fed. R. Evid. 613(a) reads: "In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel."

responsible for the kidnapping, that the victim suffered bodily harm, that the kidnappers used a dangerous weapon, and that the victim was released more than seven days after his capture. In addition, USSG § 2A4.2(b), the Guideline applicable to Brika's conviction under 18 U.S.C. § 875, instructed the judge to apply USSG § 2A4.1 "[i]f the defendant was a participant in the kidnapping offense . . . ." Applying USSG § 2A4.1 increased the base offense level from 23 to 32 and, with all of the enhancements taken into account, changed Brika's sentence from five years to the maximum of twenty years. In applying the cross-reference, the judge essentially found Brika guilty of a crime on which the jury had hung. Therefore, although the jury did hear evidence relating to the conspiracy charge, by not coming to a verdict it did not make any factual findings.

At sentencing, Brika objected to the various enhancements, but he did not specifically make a Sixth Amendment claim. Nonetheless, we review sentencing enhancements in violation of the Sixth Amendment under plain error review. *United States v. Oliver*, 397 F.3d 369, 380-81 (6th Cir. 2005). In light of the district court's clear use of facts not found by the jury to increase Brika's sentence by a substantial amount, we vacate the sentence and remand this case to the district court for resentencing in a manner consistent with *United States v. Booker*, 125 S. Ct. 738 (2005).

For the foregoing reasons, we **AFFIRM** Brika's conviction but **VACATE** his sentence and **REMAND** for resentencing.